# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| LEO HARDY,<br><br>                Plaintiff,<br><br>v.<br><br>CITY OF MILWAUKEE, MICHAEL GASSER,<br>KEITH GARLAND, JR., and<br>MICHAEL VALUCH, JR.,<br><br>                Defendants. | Case No. 13-CV-769-JPS |
| CHAVIES HOSKIN,<br><br>                Plaintiff,<br><br>v.<br><br>CITY OF MILWAUKEE, EDWARD FLYNN,<br>EDITH HUDSON, JASON MUCHA,<br>MICHAEL VAGNINI, and THOMAS MAGLIO,<br><br>                Defendants. | Case No. 13-CV-920-JPS |
| EDWARD EARL WRIGHT,<br><br>                Plaintiff,<br><br>v.<br><br>MICHAEL VAGNINI, JACOB KNIGHT,<br>JEFFREY CLINE, GREGORY M. KUSPA,<br>JASON MUCHA, EDWARD FLYNN, and<br>CITY OF MILWAUKEE,<br><br>                Defendants. | Case No. 14-CV-1224-JPS |
| JERMAIN CAINE,<br><br>                Plaintiff,<br><br>v.<br><br>CITY OF MILWAUKEE, EDWARD FLYNN,<br>EDITH HUDSON, JASON MUCHA,<br>MICHAEL VAGNINI, JACOB KNIGHT, and<br>JEFFREY DOLLHOPF,<br><br>                Defendants. | Case No. 14-CV-1548-JPS<br><br><br>**ORDER** |

      The above-captioned cases come before me on a Milwaukee Deputy City Attorney's separately-filed motions, which request that I disqualify myself from further participation in each of these cases. The cases all stem from alleged strip searches conducted by officers of the Milwaukee Police

Department. I have been assigned to preside over each case, but the defendants now request that I step aside.

In my role as presiding judge, I have rendered decisions that are unfavorable to the City.[1] However, I have also decided against the plaintiffs on important issues. For instance, I recently reduced a jury award in favor of one of the plaintiffs by $446,000.00, or a little less than 90%. This is often the nature of the adversarial process: each party wins some and loses some.

Along the road, I have also admonished the City's attorneys to conduct themselves professionally and in accordance with my expectations. Shortly after I began receiving strip search cases, I made clear that I intended to resolve the cases expeditiously, noting:

> [T]he City is going to be pretty busy defending them....And you may have to get outside counsel; but these cases are going to move in this branch of the court, as all civil cases are. You know, [R]ule [O]ne of the Federal Rules of Civil Procedure was put there long before we had the Civil Justice Reform Act of 1990; and that rule is the touchstone of many of us in terms of ensuring that the orderly administration of justice go forward and these cases not languish.

> Unlike fine wine, they do not get better with age. And whether it's the Milwaukee Police Department or the Wisconsin Department of Corrections, very sadly we have a cornucopia of litigation involving prisoner rights and police officers who apparently stray from that which we expect from the law enforcement community. And the sooner these cases are addressed in open court, the sooner we will have a law enforcement community that can be proud of their work and the community proud to have them working. But, unfortunately, we do not see that today particularly in light of these cases.

---

[1] In each of these cases, the City provides representation to all of the defendants. For the sake of clarity, I will refer to all of the defendants, collectively, as "the City."

> So, Ms. Lappen, I would suggest that you go back to Mr. Langley [the City Attorney]…and have him assign appropriate resources because we're going to bring these cases to a conclusion whether in July or September.

(Case No. 13-CV-1114, Docket #20 at 4:5–5:4). In each of the respective trial scheduling orders in these cases, I stated that, "while every litigant is entitled to their day in court, they are not entitled to intrude upon someone else's day in court." (*See, e.g.*, Case No. 13-CV-769, Docket #31 at 7; Case No. 13-CV-1114, Docket #17 at 7; Case No. 13-CV-1224, Docket #25 at 7). Consistent with these admonitions, I fully expected the City Attorney's office to move the cases along expeditiously. I also expect every lawyer appearing before me, as an officer of the court, to adequately prepare for trial, to work cooperatively with opposing counsel, and to avoid submitting poorly-supported legal arguments. To be sure, adversaries and litigants remain free to carry on as they would please in protracting their dispute(s). However, the wise exercise of judicial stewardship of limited taxpayer resources will not do service in providing a forum or safe harbor to do so.

Unfortunately, representatives of the Milwaukee City Attorney's office have occasionally failed to meet my expectations. Despite an Assistant City Attorney having agreed "wholeheartedly on getting these [cases] resolved as quickly as possible" (*Id.* at 5:5–8), the City has often found it difficult to cooperate with the plaintiffs, resulting in significant wasted time and resources. Thus, on several occasions, I let the Assistant City Attorneys know that they were not meeting my expectations. But, throughout the course of this litigation, I have always approached the parties' positions evenhandedly, providing detailed legal analysis whenever I have resolved disputed matters before me.

Of course, what I know to be true is ultimately irrelevant to resolution of the disqualification motions at hand, as I must employ an objective standard to resolve them. I relay my perspective on this only to make clear that, as I do in every case, I have approached each case fairly. Suffice it to say that I was more than surprised—indeed, taken aback—by the City's motions. To be sure, in what will soon become 28 years as an Article III district judge, I will have been assigned well over 7,000 civil cases, including more than 70 involving the City of Milwaukee and/or its agents and employees as named parties. Yet, it appears that the motions before me today represent but only the second instance of a kerfuffle in pending civil litigation in which I have been asked to step aside. The first dates all the way back to May of 1988 in *Bassler v. Eisenberg*, Case No. 87-CV-1345. More on *Bassler* later.

In addressing each of the pending motions, I will first provide a bit of background about the separate cases and the City's motions. I will then discuss the legal standard governing disqualification requests. Finally, I will apply that standard to the City's pending motions. As appears from the analysis of both the relevant facts and the applicable law which follows, my fairness and impartiality cannot reasonably be questioned. Thus, I am obliged to deny the City's motions that I be disqualified.

1.      BACKGROUND

1.1      Procedural Posture of the Cases

Each of the plaintiffs in the above-captioned cases—Leo Hardy, Chavies Hoskin, Edward Wright, and Jermain Caine—alleged that they had been strip searched by police officers employed by the Milwaukee Police Department ("MPD"). The cases were assigned to me, though each is at a different stage of proceedings.

The newest case—*Caine v. Milwaukee*, Case No. 14-CV-1548—is scheduled for a trial to begin on January 11, 2016.[2] On March 20, 2015, I held a scheduling conference in the case, at which I made a comment that forms a portion of the basis for the City's disqualification request. There are no dispositive motions outstanding in *Caine*.

*Wright v. Vagnini*, Case No. 14-CV-1224, is in a posture similar to *Caine*. *Wright* is set for trial to begin on October 19, 2015, and there are no dispositive motions outstanding.

*Hoskin v. City of Milwaukee*, Case No. 13-CV-920, was originally assigned to me, and I denied the City's motion for judgment on the pleadings. I then declined to adjourn the July 14, 2014 trial date in the case, after which the parties agreed to consent to proceed before Magistrate Judge William Callahan. Magistrate Callahan adjourned the trial date and presided over the case until he relinquished it in preparation for retirement. At that juncture, with the City's motion for summary judgment pending, Mr. Hoskin refused to proceed before Magistrate Judge William Duffin. As a result, the case was returned to me.

The oldest case, *Hardy v. City of Milwaukee*, Case No. 13-CV-769, was tried to a jury. On August 7, 2014, the jury returned a verdict, finding that Mr. Hardy had been illegally stopped and searched but not illegally strip-searched. The jury awarded Mr. Hardy a total of $506,000.00, composed of $6,000.00 in compensatory damages and $500,000.00 in punitive damages. The City then filed two post-trial motions seeking to overturn the jury's verdict. As I have already noted, I granted one of those motions in part, significantly reducing the jury's punitive damages award. The City points to

---

[2]It may be very confusing to cite to the docket sheets in each of the four separate cases, so I will do so sparingly and only where absolutely necessary.

two statements from my order granting that reduction as evidence in favor of the current motions.

Finally, I received three other strip search cases that are no longer pending before me (and so are not subject to the City's disqualification motions). Two of those cases are now closed: *Venable v. City of Milwaukee*, Case No. 13-CV-1114, and *Bohannon v. City of Milwaukee*, Case No. 13-CV-1224. In *Venable*, I denied the City's motion for summary judgment. The City appealed that decision, but reached a settlement with the plaintiff while the appeal was pending. In *Bohannon*, I also denied the City's motion for summary judgment (which was identical in many ways to the City's motion for summary judgment in *Venable*). The City did not appeal my order in *Bohannon*. Instead, the parties prepared to go to trial. I held a final pretrial conference, at which I made statements critical of the City's approach to handling the case. Those statements also form a portion of the basis for the City's pending motions. In the end, *Bohannon* settled prior to trial and was dismissed. In the third case, *Freeman v. City of Milwaukee*, Case No. 13-CV-918, I denied motions from the City for a more definite statement and for judgment on the pleadings. The parties thereafter consented to proceed before Magistrate Judge Nancy Joseph; that case remains pending.

### 1.2    The City's Recusal Motions

The City filed four separate motions to disqualify me,[3] one each in *Caine*, *Wright*, *Hoskin*, and *Hardy*. In support, the City cites to four separate statements that I have made: two from my post-trial order in *Hardy*, one from the final pretrial conference in *Bohannon*, and one from the scheduling conference in *Caine.* The City argues that, in light of those statements, a

---

[3]Each of the motions is practically identical, so I will address them together, applying the same law.

reasonable observer could question my impartiality. Thus, according to the City, I am required to recuse myself under 28 U.S.C. § 455(a).

In the balance of today's order, I will refer to the statements in question as the Flynn statements, the Vagnini statements, the *Bohannon* statements, and the *Caine* statements, respectively.

**The Flynn Statements.** I made statements concerning MPD Chief Edward Flynn on page 49 and in footnote 19 of my post-trial order in *Hardy*. (Case No. 13-CV-769, Docket #251 at 49 n.19). In that portion of my post-trial order, I was addressing whether to reduce the jury's punitive damages award. In doing so, I applied the five factor test described by the Supreme Court in *State Farm* to determine whether the defendant officers' actions in the *Hardy* case were reprehensible. (Case No. 13-CV-769, Docket #251 at 49 n.19) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)). The Flynn statements related to the fourth factor from the *State Farm* test. (*Id.*) I held that: "The fourth factor does not weigh heavily in either direction. There was no evidence produced at trial to show that the defendant officers had engaged in repeated acts of this sort." (*Id.* at 49). Then, in a footnote, I stated:

> However, with that said, it is apparent that MPD has opted to continue the sort of illegal stops that Mr. Hardy was subject to. MPD Chief Edward Flynn has made clear that one of his prerogatives is encouraging large amounts of pedestrian stops, regardless of the reasons. In criticizing *Floyd v. City of New York*, the Southern District of New York case finding the New York Police Department's stop-and-frisk tactics illegal, Chief Flynn stated, "That's what worries us about what's happening in New York. It would be a shame if some people decided to put us back in our cars just answering calls and ceding the streets to thugs." Heather MacDonald, "How To Increase the Crime Rate Nationwide," *The Wall Street Journal* (June 11, 2013) (quoting previous Flynn statements to *L.A. Times*).

(Case No. 13-CV-769, Docket #251 at 49 n.19).

*The Vagnini Statements.* I made statements about former MPD Officer Michael Vagnini on page 13 and in footnote 8 of my post-trial order in *Hardy*. (*Id.* at 13 n.8). There, I provided background details regarding an evidentiary challenge lodged by the City. (*Id.*) In post-trial motions, the City argued that I erred in allowing one of the defendant officers to testify regarding prior statements he made in an investigation of Michael Vagnini. (*Id.*) In addressing that argument, I provided some background about the prior statements: "At trial, the Court allowed Mr. Hardy's attorneys to question Officer Gasser regarding a prior strip search. Officer Michael Vagnini conducted that prior search with Officer Gasser present." (*Id.* at 13) (internal citations and footnote omitted). Where I mentioned Officer Vagnini, I provided some background information in footnote 8: "Officer Vagnini was MPD's primary strip-search offender. He is now serving a prison sentence as a result of his criminal actions in improperly searching individuals. He is also a defendant in many of the strip-search cases now pending in this district, although he is not a defendant in this case." (*Id.* at 13 n.8).

*The* **Bohannon** *Statements.* My statements in *Bohannon* come from the final pretrial conference. (Case No. 13-CV-1224, Docket #142 at 12:17–14:19). There, I criticized attorneys for both parties for failing to work together and for filing an extremely large amount of motions *in limine*. (*Id.*) I also commented upon the effects of the strip search lawsuits. (*Id.*) In full, I stated:

Well, I'm here to try the case; but I can tell you as a judge after 27 years of experience, I would far, far enjoy being in a trial where the lawyers are prepared and are as professional as they can possibly be.

But when lawyers are in one another's face, and they cannot even agree on the time of day much less anything else, it's an exasperating experience. And we hear it from jurors, and we hear it from court reporters and staff, you know, why do lawyers have to behave this way. This is a profession. This is not mud wrestling.

And so when I read that -- and I refer to them generically not in a pejorative way -- really, the brickbats that are thrown in these settlement reports, well, they never gave us the money, and they didn't call us back. Come on. This is 2014, not 1894, you know.

This isn't the world where you can just keep pushing the button on the word process[o]r and bludgeon the court and opposing counsel with a blizzard of paperwork.

You know, the last time I had a case that had so many motions in limine was the case involving Quad Graphics, a verdict form with over 200 questions, 60 some motions in limine. I mean, it was an unfortunate unbelievable experience, and the jurors come away from a case like that wondering, is this really the way the legal profession is designed to run. And the answer is clearly no.

But that's what happens when communications break down and when lawyers are unable, for whatever reason, to be respectful to one another. You can respectfully disagree, but you don't have to do it in a manner that is all but an assault.

And there's plenty of assault in this case in terms of the war of words and the e-mails and the sniping that goes on. That's not the way lawyers ought to practice law.

> If the facts are on your side, you're going to prevail; but, unfortunately, in these cases from what the Court has seen thus far, the City has got a very, very tall order to be an effective defender of what occurred particularly when you see what occurred in this and other cases if only what's come through the criminal justice system with the likes of Mr. Vagnini and others. That's not the way our system is designed.

> And, eventually, it comes at a very, very high cost whether it's morale in the police department, whether it's the citizens['] respect for the rule of law in the community, that **there are those in [the] City that want to defend this sort of conduct. It's plainly unconscionable. That's the end of the discussion.**

> So it's time to roll up the sleeves and get real serious about [where] we are going with this because on a long-term basis while Milwaukee is certainly no Ferguson, Missouri,…it's certainly becoming a bit of a tinder box, if you will, if you look at the public outcry whether it's why don't we have more cameras whether it's on individual officers or in police cars; and the same holds true in the jail. I mean, the technology, unfortunately, has not caught up with reality.

(*Id.*) (emphasis supplied in City's motions). In its motions, the City focuses primarily on the three final paragraphs that I just quoted.

**The Caine Statements.** My statements in *Caine* come from a scheduling hearing and reference the still-pending motion for summary judgment in *Hoskin*. (Case No. 14-CV-1548, Docket #16 at 4:20–5:24). There, I asked the City to ensure that its summary judgment motion in *Hoskin*—which I had just received back on reassignment from Magistrate Judge Callahan—did not raise frivolous arguments. (*Id.*) In full, I stated:

> I'm glad that you've averted to that because the comments that I want to impart this morning both in this case and now in Hoskin – and I appreciate that Mr. Nichols is not yet involved in the Hoskin case -- but with the level of litigation that is swirling around the Milwaukee City Attorney's Office like bees

around honey, I'm certain that Mr. Langley is going to have to engage outside counsel because just yesterday we received another strip search case that was filed.

And my point in all of this is for your benefit, Mr. Nichols. The City filed a 50-page summary judgment motion in the Hoskin case; and they have the benefit of Judge Stadtmueller's view, not only on the law, but how to best proceed.

**And if the City defendants are going to replicate some of the non-starter arguments that were raised in *Hardy* and *Venable* and *Bohannon*, they are going to find themselves on the short end of the stick with sanctions.**

And so the first order of business in a scheduling order that will issue in Hoskin is, before the plaintiffs respond to the summary judgment motion that was filed by the City, I'm going to redirect the City Attorney's Office or their outside counsel to review that submission against the backdrop of the Court's rulings in *Hardy*, in *Venable*, and *Bohannon*; and we will graciously accept new arguments. But matters that have been litigated and re-litigated and now to be re-litigated again simply are not effective representation of the interests of one's client, and they will not be tolerated in this branch of the court. And so, as they say, a word to the wise is more than sufficient.

(*Id.*) (emphasis supplied in City's motions).

The City's motions assert: (1) that the Flynn statements and Vagnini statements derive from extrajudicial sources; and (2) that the *Bohannon* and *Caine* statements would cause a reasonable person to question whether I could be impartial in reaching legal determinations on the issues before me.

The plaintiffs in each case filed responses to the City's motions, and the City filed practically identical replies thereto.

## 2.    STANDARD OF REVIEW

28 U.S.C. § 455(a), pursuant to which the City has moved for disqualification, provides that "[a]ny justice, judge, or magistrate judge of the

United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The Supreme Court elaborated upon this standard in *Liteky v. United States*, 510 U.S. 540 (1994). The Supreme Court noted that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)). Rather,

> [i]n and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal.

*Liteky*, 510 U.S. at 555. The Supreme Court also made clear that,

> opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Id.* (emphasis in original). The Supreme Court went on to point to an example of a high degree of favoritism: a 1921 case against two German-American defendants in which the presiding judge stated that "'[o]ne must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans' because their 'hearts are reeking with disloyalty.'" *Id.* (quoting *Berger v. United States*, 255 U.S. 22, 28 (1921)).

The Supreme Court, in *Liteky*, provided guidance about the meaning and importance of "extrajudicial sources."

> As we have described [the extrajudicial source doctrine], however, there is not much doctrine to the doctrine. The fact that an opinion held by a judge derives from a source outside judicial proceedings is not a necessary condition for "bias or prejudice" recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice. Nor is it a sufficient condition for "bias or prejudice" recusal, since some opinions acquired outside the conduct of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will not suffice. Since neither the presence of an extrajudicial source necessarily establishes bias, nor the absence of an extrajudicial source necessarily precludes bias, it would be better to speak of the presence of a significant (and often determinative) "extrajudicial source" factor, than of an "extrajudicial source" doctrine, in recusal jurisprudence.

*Liteky*, 510 U.S. at 554–55. The Sixth Circuit summarized this point well: "[A]n extrajudicial source for a judge's opinion about a case or a party is neither necessary nor sufficient to require recusal. Instead, the presence of an extrajudicial source is merely a thumb on the scale in favor of finding either an appearance of partiality under § 455(a)...." *Bell v. Johnson*, 404 F.3d 997, 1004 (6th Cir. 2005). I also note that the Supreme Court has described the concept of an extrajudicial source as being rooted in "the pejorative connotation of the words 'bias or prejudice'":

> It seems to us that the origin of the "extrajudicial source" doctrine, and the key to understanding its flexible scope (or the so-called "exceptions" to it), is simply the pejorative connotation of the words "bias or prejudice." Not *all* unfavorable disposition towards an individual (or his case) is properly described by those terms....The words connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the

subject ought not to possess…or because it is excessive in degree.

*Liteky*, 510 U.S. at 550 (emphasis in original).

The Supreme Court also noted that it would be rare to find bias on the basis of a judge's attempts at courtroom administration, even if those efforts are harsh. "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger…are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Id.* at 555–56. Such "ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.* at 556.

The Seventh Circuit has also offered additional guidance in interpreting *Liteky*. The Seventh Circuit has clarified that the relevant question for purposes of 28 U.S.C. § 455(a) disqualification is whether "the judge's impartiality might reasonably be questioned by a 'well-informed, thoughtful observer rather than to a hypersensitive or unduly suspicious person.'" *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 988 (7th Cir. 2001) (quoting *Hook v. McDade*, 89 F.3d 350, 354 (7th Cir. 1996); citing *In re Mason*, 916 F.2d 384, 386 (7th Cir. 1990)); *accord Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000) (Rehnquist, C.J., in chambers) (§ 455(a) "inquiry is an objective one, made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances"). "That an unreasonable person, focusing on only one aspect of the story, might perceive a risk of bias is irrelevant.…[A] reasonable person is able to appreciate the significance of the facts in light of relevant legal standards and judicial practice and can discern whether any appearance of impropriety is merely an illusion." *In re Sherwin-Williams Co.*, 607 F.3d 474, 477-78 (7th Cir.

2010) (citing *Cheney v. United States Dist. Court*, 541 U.S. 913, 924 (2004) (Scalia, J., in chambers); *United States v. Bonds*, 18 F.3d 1327, 1331 (6th Cir. 1994); *In re Mason*, 916 F.2d at 387). This standard is entirely objective. *Listecki v. Official Comm. of Unsecured Creditors*, No. 13-2881, ---- F.3d ----, 2015 WL 1010089, at *17 (7th Cir. Mar. 9, 2015) (citing *In re Hatcher*, 150 F.3d 631, 637 (7th Cir. 1998); *Hook*, 89 F.3d at 354). Moreover, unless the risk of an appearance of partiality is "'substantially out of the ordinary,'" disqualification is not required. *Hook*, 89 F.3d at 354 (quoting *In re Mason*, 916 F.2d at 385–86). There is a "general presumption…that judges rise above any potential biasing influence," *Tezak v. United States*, 256 F.3d 702, 718 (7th Cir. 2001) (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)), as judges are "'obligated not to recuse [themselves] without reason,'" *New York City Dev. Corp. v. Hart*, 796 F.2d 976, 981 (7th Cir. 1986) (quoting *Suson v. Zenith Radio Corp.*, 763 F.2d 304, 308–09 n.2 (7th Cir. 1985)).

3.    **ANALYSIS**

With those general standards in mind, I now turn to analyzing the City's specific arguments in favor of disqualification.

### 3.1    The Flynn Statements

The parties dispute whether the Flynn statements constitute reliance on an extrajudicial source. Because the City is questioning my appearance of impartiality, which I take very seriously, I want to give the City every benefit of the doubt. I, therefore, assume that the Flynn statements rely upon an extrajudicial source. *See Liteky*, 510 U.S. at 554–55.

But that, alone, does not require disqualification under § 455(a). It is merely a factor to consider in my analysis, rather than an independently sufficient cause for recusal. *See, e.g.*, *Liteky*, 510 U.S. at 554–55; *Bell*, 404 F.3d at 1004. What I must actually look for is whether there is an appearance of "a

favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that [I] ought not to possess…or because it is excessive in degree." *Liteky*, 510 U.S. at 550 (emphasis in original).

I do not believe any of that is the case here. In making the Flynn statements, I mentioned a news article. I attempt to stay informed by reading the news from various sources, which clearly is not inappropriate. *See, e.g.*, *Dean v. Colvin*, 585 F. App'x 904, 904-05 (7th Cir. 2014) (in context of ALJ's social security ruling, noting that "Judges do not violate the Constitution by consulting their own funds of knowledge about the world, or by augmenting that knowledge. This court does so regularly. No judge is required to approach a case in complete ignorance. An open mind is required; an empty mind is not.") (citing *Liteky*, 510 U.S. 540); *In re Larson*, 43 F.3d 410, 411-12 (8th Cir. 1994) (disqualification not required where district judge preemptively warned parties that he would reject a plea agreement after reading in a newspaper that parties planned to enter a plea agreement).

The Flynn statements also do not evidence any sort of wrongful, excessive, or preordained view of the facts, law, or parties[4] in the cases before me, especially in light of the Seventh Circuit's opinion in *Sherwin-Williams*. In that case, the district judge had previously written an article approving of

---

[4]It is not entirely clear whether the City believes that I appear biased against Flynn or against all of the City defendants on the claims in question. It seems most likely to be the latter, as the City mentioned in its opening and reply briefs that it believes the Court has pre-judged *Monell*-related issues in these cases. (*See* Opening Br. ¶ 4; Reply at 4–5). To the extent the City is arguing that I appear biased against Flynn, individually, they have not provided any briefing to support that contention. In any event, as I make clear in my analysis, the entire context of this case indicates that I have and will continue to resolve the issues fairly, regardless of the parties or issues before me.

a Wisconsin Supreme Court case. *Sherwin-Williams*, 607 F.3d at 477-78. A party before the district judge, hoping to attack the applicability of that very case, moved for disqualification. *Id.* The district judge refused and the Seventh Circuit affirmed. *Id.* The Seventh Circuit held that the district judge's previous expression of his views—based, no doubt, on a variety of extrajudicial sources—was "irrelevant," because the district judge was constrained to apply the law to the facts at hand. *Id.* at 478. I face the same situation: regardless of my rulings and statements, I remain obliged to apply the law to the facts at hand. Without a doubt, I previously ruled that the search of Mr. Hardy was unconstitutional, but that previous ruling cannot form the basis for my disqualification. *See, e.g., Liteky*, 510 U.S. at 555; *Frey v. E.P.A.*, 751 F.3d 461, 472 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 494 (2014) (disqualification not required where judge presided over prior proceedings and rendered adverse decisions). My ruling was also the product of ample legal analysis. Reading the Flynn statements as strongly as possible, I implied only that I would find illegal the same "sort of…stop[] that Mr. Hardy was subject to," in light of my analysis. But that does not, in any way, mean that I have predetermined that all of the stops in these cases are illegal. When presented with the differing facts of each case, I must fairly apply the law, employing the same sort of rigorous legal analysis I applied in the post-trial order in *Hardy*.

Finally, it is extremely important to note the context of the Flynn statements. They formed a brief parenthetical in my *Hardy* post-trial order; and that order could appropriately be described as a significant victory for the City. With it, I reduced the jury verdict in favor of Mr. Hardy by *$446,000.00.* (Case No. 13-CV-769, Docket #251 at 55). That is close to a 90% reduction. Additionally, and perhaps more importantly, the statements

followed my extremely detailed analysis of the legality of the stop of Mr. Hardy. (*Id.* at 26–45). My discussion on that topic ran from the middle of page 26 to the top of page 45 of the order, analyzing and citing cases from the Seventh Circuit, Wisconsin, and multiple other circuits. (*Id.*) Any reasonable person with full knowledge of the facts and the relevant legal standards, *see, e.g.*, *Sherwin-Williams*, 607 F.3d at 477–78 (citations omitted), would believe me to be impartial. The Flynn statement is but an extremely small part (and, if read in context, one upon which I placed no judicial reliance) in the scheme of a much larger, extremely detailed order that was of huge benefit to the City. Seeing as I made the Flynn statements in the context of an order that was of great benefit to the City, clearly evidencing my ability to make a fair judgment, I find that a reasonable, well-informed observer could not question my impartiality.

For all of these reasons, I reject the City's argument that the Flynn statements require my disqualification.

### 3.2 Vagnini Statements

It is extremely difficult to make an effective argument that the Vagnini statements rely on an extrajudicial source. Throughout the *Hardy* proceedings, I was presented with information about Officer Vagnini's prior searches and conviction. (*See, e.g.*, Case No. 13-CV-769, Docket #158, #163 (both addressing Vagnini's prior searches, although the information was also presented in numerous other documents throughout the course of the case)). There is also no denying that Officer Vagnini has been named as a defendant in a significant number of the strip search cases in this district. All of this information comes directly from my interaction with this series of cases, as opposed to some other, extrajudicial source. Under *Liteky*, the Vagnini statements are clearly appropriate as the information on which they rely

constitute "facts introduced or events occurring in the course of the current proceedings, or of prior proceedings." 510 U.S. at 555.

However, even if the Vagnini statements *did* rely on some extrajudicial source, they would not require my disqualification. My statement was entirely factual and I provided it only to orient the reader as to Officer Vagnini's role in the evidentiary dispute. In any future case involving Officer Vagnini, there will undoubtedly be evidentiary disputes regarding the admissibility of his conviction, requiring me to review and pass upon the importance of the information again.[5] There is no question that I can do so objectively, seeing as I have already displayed my ability to closely consider the import of an individual's arrest; in the *Hardy* case, I acknowledged Mr. Hardy's plea yet still treated him fairly. (*See, e.g.*, Case No. 13-CV-769, Docket #93 at 16–21 (addressing import of Mr. Hardy's plea)). Likewise, the mere fact that I acknowledged Officer Vagnini's plea does not in any way telegraph some sort of bias against him.

Finally, I again note the important context of the Vagnini statements: an exhaustive, 56-page order that granted the City a monumental reduction of the jury award in *Hardy*. Given that the Vagnini statements were a factual parenthetical to a decision that was otherwise extremely favorable to the City, I do not believe that there is any chance that an informed observer could reasonably question my impartiality. Again, I struggle to see how I

---

[5]Again, I note that it is not clear whether the City is arguing that I appear biased against Vagnini, personally, or against him or the City defendants on specific issues. In its opening brief, the City asserts that "the Court has reached substantive conclusions regarding" Vagnini's conduct, but did not provide further elaboration. (Opening Br. ¶ 7). The City did not address the issue at all in its reply brief. In either event, as I discuss further above, I remain steadfast in believing that I could not appear partial regarding parties *or* claims.

could be viewed as unable to "make [a] fair judgment," *Liteky*, 510 U.S. at 555, as a result of statements I made while rendering a fair judgment in favor of the City.

For all of these reasons, I reject the City's argument that disqualification is required by the Vagnini statements.

### 3.3    The *Bohannon* Statements

The City argues that the *Bohannon* statements, specifically my use of the word "unconscionable," might create the appearance that I am not impartial, because there were "no findings to support such an assertion," and would cause a reasonable person to question my impartiality in resolving the legal issues before me. (Opening Br. ¶ 11). In its reply, the City argues that my statements must have been "based on a conclusion that Michael Vagnini had not only been guilty in the matters for which he was serving a prison sentence, but that he was guilty of illegally searching Mr. Bohannon before that matter went to trial." (Reply at 5). I disagree with both of the City's assertions.

To begin, it appears that the City is misreading my statements. The City seems to believe that I was accusing its defense of the strip search cases as unconscionable, and emphasizes the following statement I made: "there are those in [the] City that want to defend this sort of conduct. It's plainly unconscionable. That's the end of the discussion." If an observer were to have stepped into court and remained only for the duration of that statement, that observer might believe that I was saying that the defense of any strip search suit would be unconscionable. But such a blindered observer is not the object of this inquiry. Instead, as I have already noted, I must ask whether a fully-informed observer might perceive me to lack impartiality. *See, e.g.*, *O'Regan*, 246 F.3d at 988 (quoting *Hook*, 89 F.3d at 354).

An informed observer would not make such a mistake. The full context reveals only that I was urging the City to "get serious" about its approach to these and related cases as well as the issues underlying the cases. I noted that MPD, its leadership, and its officers were the subject of many lawsuits; that the City appeared to face an uphill battle in defending the actions; and that the fact that some "in [the] City… want to defend this sort of conduct" results in diminished morale in the MPD and lack of citizen respect for the rule of law. (Case No. 13-CV-1224, Docket #142 at 13:24–14:19). My reference to the individuals "in [the] City" did not refer to the lawyers in the case, but instead to City leadership who has elected to oppose the strip-search lawsuits without any indication of efforts to combat the systemic problems that gave rise to the suits in the first place. This is clearly supported by my statements that followed, in which I noted that there has been public outcry as to why there are not more cameras on individual officers or in police cars. Perhaps I disapproved of the City's approach to dealing with these cases and their fallout, but an observer would not reasonably perceive that I lack impartiality in the cases. No matter how critical I may be of the approach, I continuously made clear that each case deserved to be considered on the merits and that I would resolve them as such. Most importantly, I made very clear that "[i]f the facts are on your side, you're going to prevail." (Case No. 13-CV-1224, Docket #142 at 14:24–25). I do not know how I could have made it any clearer that I would view the facts of each case fairly.

Additionally, the *Bohannon* statements that the City relies upon came at the end of a statement I was making to *both* parties, urging them to work together. (*Id.* at 12:17–14:19). With my statements, I noted that the parties had not been cooperating with one another, and were instead filing an exceptional number of motions. (*Id.* at 12:17–13:23). I held the *Bohannon*

hearing shortly after I concluded trial in *Hardy*, which was a very difficult trial to administer because the parties' attorneys struggled to cooperate. With my *Bohannon* statements, I hoped to achieve greater cooperation. And the language I used *was* appropriately stern. But, generally, that does not provide a basis for disqualification. As the Supreme Court has made clear, "expressions of impatience, dissatisfaction, annoyance, and even anger…are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Liteky*, 510 U.S. at 555–56. Such "ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration remain immune." *Id.* at 556.

Finally, I also make note of the important context of the *Bohannon* statements. If an observer had been present for the full hearing, he or she would have seen me: (1) reject the plaintiff's request to introduce an illegal search claim (Case No. 13-CV-1224, Docket #142 at 8:9–22); and (2) threaten pretrial dismissal of the plaintiff's *Monell* claim if the plaintiff could not establish evidence of custom, policy or practice (*Id.* at 6:13–25). Both of those actions were favorable to the City. And it is on those two issues—illegal searches and potential *Monell* claims—that the City seems to argue I may appear biased. If I were biased on those claims, why would I dismiss one and threaten to dismiss the other? My actions are totally inconsistent with any bias.

In light of the foregoing, I do not believe that any observer with adequate view of the facts could reasonably view me as lacking impartiality. I, therefore, reject the City's argument that disqualification is required by the *Bohannon* statements.

### 3.4 The *Caine* Statements

Last, the City challenges the *Caine* statements as inappropriate because I threatened sanctions in the event that the City's attorneys "replicate[d] some of the non-starter arguments that were raised in *Hardy* and *Venable* and *Bohannon*." (Case No. 14-CV-1224, Docket #16 at 5:9–12). The City asserts that these statements would lead a reasonable observer to conclude that I have "pre-ruled on summary judgment" and will, therefore, reject any of the City's arguments out of hand. (Opening Br. ¶ 6).

The City's conclusion is a misreading in light of the full context of the strip search cases. I have now handled three strip search cases that have reached the summary judgment stage—*Hardy*, *Venable*, and *Bohannon*. In each, the City asserted various grounds for summary judgment that I was obliged to reject because of factual disputes. (*See, e.g.*, Case No. 13-CV-769, Docket #93 at 14–15, 23–24; Case No. 13-CV-1114, Docket #89 at 6–8; Case No. 13-CV-1224, Docket #79 at 6–7). To be sure, these did not involve close calls. Also, in *Hardy*, the City asserted that the plaintiff could not sustain his false arrest claim as a result of his guilty plea. (Case No. 13-CV-769, Docket #93 at 18–22). I considered this, but denied it without prejudice because the City had neither analyzed the issue with any depth nor supported the argument with the necessary facts. (*Id.*) I, nonetheless, offered the City the opportunity to renew the issue if they wished to do so. (*Id.*) The City did not do so.

I raise my prior summary judgment rulings to provide context. Before the *Caine* scheduling conference, I reviewed the motion for summary judgment filed by the City in *Hoskin*, which I had recently received by way of reassignment from Magistrate Callahan. In doing so, I noted that the motion rested upon many of the grounds I had previously rejected in *Hardy*, *Venable*, and *Bohannon*. Thus, I concluded that I should urge the City to seriously reconsider its *Hoskin* arguments to ensure that they were not

frivolous like many of the arguments made in *Hardy*, *Venable*, and *Bohannon*. I said as much in the *Caine* scheduling conference, but also informed the City that I would be issuing a scheduling order requiring that the City review its *Hoskin* submission. (Case No. 14-CV-1224, Docket #16 at 5:13–24). The City did not wait for that order before filing the present motions to disqualify. Had the City waited, it would have received a scheduling order advising it to review its *Hoskin* submission in light of the following findings:

(1) The defendants' argument that personal-capacity claims against Chief Flynn should be dismissed (Docket #68 at 3) is similar to other arguments that the defendants have raised, resulting in the plaintiffs agreeing to dismiss claims. The same can be said of the defendants' argument that the municipal and official capacity claims are redundant. (Docket #68 at 48–49). Rather than raise these arguments in a summary judgment brief, the defendants should first seek to determine whether the plaintiff will agree to dismiss the related claims. If so, then the parties may file a stipulation of dismissal of the claims. If not, then the defendants may properly assert the arguments on summary judgment.

(2) In its summary judgment order in *Hardy*, Case No. 13-CV-769, Docket #93 at 16–21, the Court considered an argument similar to the *Rooker-Feldman* argument that the defendants now raise (Docket #68 at 3–7). The defendants should read and re-read the Court's prior order in *Hardy* to determine whether it is worthwhile to assert this *Rooker-Feldman* argument now.

(3) Given anticipated disputes of material fact—just as have been present in all of the other strip search related cases before the Court—it is likely very difficult for the defendants to prevail on their arguments that: (a) the stop and search of the plaintiff were constitutional (Docket #68 at 7–17); (b) certain officers are entitled to qualified immunity (Docket #68 at 17–23); (c) the failure to intervene claims must be dismissed (Docket #68 at 23–25); (d) the *Monell* claim must be dismissed (Docket #68 at 25–45); and (e) the supervisory liability claim must be dismissed (Docket #68 at 45–48). All of those determinations

> are extremely fact-bound. Meanwhile, there has been little agreement about the relevant facts in any of these cases. If the pattern continues, here, the defendants should strongly consider whether it is worthwhile to assert these arguments.

I have taken that language verbatim from the scheduling order that I planned to issue before receiving the City's motions. Had the City waited, I could have issued that order to clarify my statements.

In light of this full context, there is nothing inappropriate about the *Caine* statements. I am certainly permitted to draw inferences from my prior experience, both with this line of cases and with the City's attorneys. *See, e.g.*, *Frey*, 751 F.3d at 472 (disqualification not required where judge presided over prior proceedings and rendered adverse decisions). In light of the full context, it is abundantly clear that the *Caine* statements were both necessary and well placed to achieve effective case management, entirely permissible under *Liteky*, 510 U.S. at 555–56. Every summary judgment brief that comes before me puts the taxpayers on the hook at multiple levels: first, they must pay for the City to research and write the brief; second, they must pay for me to research and render a decision; and, third, if the non-movant prevails, they may also have to pay the attorneys' fees associated with their submissions to the Court. This is an expensive (not to mention time-consuming) proposition. With a bit of common sense and open communication with opposing counsel, the City could avoid rehashing arguments that are likely losers but nonetheless result in a significant outlay of taxpayer dollars. There is an old aphorism: "Those who cannot remember the past are condemned to repeat it." With my comments, I fully expected that the City would consider my

prior orders with the thought of saving the taxpayers a potentially-significant amount of money.[6]

In the end, with adequate understanding of my experience with this line of cases, any observer would fully appreciate and understand that the *Caine* statements were apropos to my role in effectively managing my docket. *Liteky*, 510 U.S. at 555–56. I, therefore, reject the City's argument that disqualification is required by the *Caine* statements.

### 3.5 Cumulative Effect

I have rejected the notion that any of these statements could be read, individually, as indicating my partiality. Even if an observer were to read them collectively, that observer could not reasonably believe that I am partial in light of the full record.

I sincerely believe that I have given the reader of this order a thoughtful perspective. Throughout the pendency of these cases, I have routinely resolved issues in favor of the City, even going so far as to: (1) dismiss or threaten to dismiss the exact types of claims upon which the City now argues I appear biased (Case No. 13-CV-1224, Docket #142 at 6:13–25, 8:9–22) (in *Bohannon*, dismissing illegal stop claim and threatening to dismiss *Monell* claim); and (2) to reduce a jury award against the City by $446,000.00, or 90%. Thus, it is difficult for me to believe that my remarks "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible," *Liteky*, 510 U.S. at 555, when I made the remarks at issue most often in the context of rendering fair judgments in favor of the

---

[6] I also note that someone within the ranks of the City's defense team appears to have taken my message to heart. On April 3, 2015, the City's outside counsel (who, I note parenthetically, appears not to have played a role in filing the disqualification motions) filed a stipulation to withdraw the motion for summary judgment in *Hoskin*. (Case No. 13-CV-920, Docket #84).

City. I have acted fairly and impartially throughout the course of these cases and none of my statements, together or separately, indicate in any way that I will not continue to do so. In this full context, I do not believe that any observer could reasonably view me as partial.

**4.     CONCLUSION**

With the benefit of the foregoing analysis, I must now deny each of the City's motions requesting that I disqualify myself in these cases. As earlier noted, many years ago, in another case in which I was asked to disqualify myself, *Bassler,* I remarked that an affidavit supporting the motion that I be disqualified was "[no]thing more than the product of a badly bruised ego resulting in a poorly disguised collateral attack on the wisdom of this court's prior rulings." (*Bassler v. Eisenberg*, No. 87-CV-1345, Docket #63 at 6); Ken Wysocky, *Judge is in Middle of 'Spat' Between Lawyer, Ex-Workers*, MILWAUKEE SENTINEL, May 16, 1988, at A5, available at https://news.google.com/newspapers?nid=1368&dat=19880516&id=XHxQAAAAIBAJ&sjid=8RIEAAAAIBAJ&pg=2487,3491743&hl=en (last visited April 7, 2015). I believe that the same statement is equally apropos of the City's motion, here, particularly as to the subject of bruised egos. The City has selectively quoted from the record—much of which I generated in reaching conclusions *favorable* to the City—to argue that I appear biased. I take my obligation to be fair and impartial very seriously and, throughout the course of this series of cases, have acted entirely consistent with that obligation. If some in the City—whether in the City Attorney's Office, the MPD, or the City's broader leadership—disagree, I am left to view their opinion–whether collectively or individually–as the "product of a badly bruised ego," rather than a well-founded belief that I have done *anything* to

indicate partiality when viewed against the backdrop of the entire record in these cases.

Accordingly,

**IT IS ORDERED** that the City's motions to disqualify me (Case No. 13-CV-769, Docket #253; Case No. 13-CV-920, Docket #80; Case No. 14-CV-1224, Docket #14; Case No. 14-CV-1548, Docket #17) be and the same are hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 10th day of April, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge